# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 25-CV-01645 (RER) (LKE)

---

NATIONAL FEDERATION OF THE BLIND OF NEW YORK STATE, INC. and ALBERT ELIA

VERSUS

NEW YORK STATE UNIFIED COURT SYSTEM and NANCY SUNSHINE, IN HER OFFICIAL CAPACITY AS COUNTY CLERK AND CLERK OF THE SUPREME COURT AND COMMISSIONER OF JURORS, COUNTY OF KINGS

---

**MEMORANDUM & ORDER**

September 14, 2026

---

**RAMÓN E. REYES, JR., District Judge:**

The National Federation of the Blind of New York State, Inc. ("NFBNY") and Albert Elia ("Plaintiffs"), bring this action against defendants, The New York State Unified Court System ("UCS" or "Defendant") and Nancy Sunshine, in her official capacity as County Clerk and Clerk of the Supreme Court and Commissioner of Jurors, County of Kings, alleging violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, the Rehabilitation Act, 29 U.S.C. §§ 794, *et seq.*, and the Equal Protection Clause of the New York State Constitution, N.Y. CONST. art. I, § 11. Defendants moved to dismiss Plaintiffs' claims for lack of standing and failure to state a claim pursuant to the Federal Rule of Civil Procedure 12(b)(6).[1]

---

[1] Defendants do not move to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

For the reasons explained below, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## **BACKGROUND**[2]

Elia is an "individual with a disability" who is blind and uses a guide dog. (ECF No. 1 ("Compl.") ¶ 3). He is a member of NFBNY, an advocacy organization for blind individuals in New York State. (*Id.* ¶¶ 11–12, 19). UCS is the judicial system of New York State that oversees the operations of the Kings County Supreme Court. [3] (*Id.* ¶¶ 21).

### I. Elia's Service on the Grand Jury

NFBNY members that live in Brooklyn, like Elia, are eligible for jury duty in Kings County. (*Id.* ¶¶ 5, 14). In October 2024, Kings Country Supreme Court summoned Elia for grand jury service. (*Id.* ¶ 5). On October 4, Elia reported for jury duty, and the court empaneled him. (*Id.* ¶ 6). He began grand jury service on October 7. (*Id.*)

An assistant district attorney presented the first case to the grand jury, which included video evidence without sound. (*Id.* ¶ 7). Elia requested to hear the video with sound. (*Id.*) The assistant D.A. explained that there was no audio and that he would "see what they could do to accommodate." (*Id.*) The grand jury heard two more cases with visual evidence, and in each instance, the assistant D.A. asked the witness to describe the visual evidence. (*Id.*)

---

[2] The Court acknowledges and offers its gratitude to Sarah Engelberg-Nolan, a judicial intern and third year law student at Fordham Law School, for her assistance in researching and drafting this memorandum and order.

[3] As detailed thoroughly below, the Court grants Defendant's motion to dismiss in part and dismisses Sunshine because she is not a necessary party. *See Hallett v. New York State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 200 (S.D.N.Y. 2000); *Fox v. State Univ. of N.Y.*, 497 F. Supp. 2d 446, 451 (E.D.N.Y. 2007). Thus, the order refers only to "defendant" throughout.

Later that day, Elia met with a judge and the assistant D.A. to discuss Elia's ability to assess photographic and videographic evidence. (*Id.* ¶ 8). The assistant D.A. sought "guidance from the Court" regarding Elia's participation in deliberation. (ECF No. 26-2, Ex. 1 ("Tr. I") at 3:9).[4] The assistant D.A. expressed concern with Elia's inability to interpret visual evidence, particularly because the government expected to present "many cases" involving "video of incidents, photographs, [and] body-worn cameras." (*Id.* at 3:12–15).

The judge asked whether Elia had "some sort of equipment to help [him] see" or whether he received information "in Braille form." (*Id.* at 3:21–24). Elia explained he "use[s] technology" if he "need[s] to see something and there is no one to assist [him]." (*Id.* at 4:1–2). Specifically, he has "an app[lication] on [his] phone" that "uses AI to describe things." (*Id.* at 4:2–4). But if he "want[s] a more reliable source, [he] will ask . . . a person . . . to describe something." (*Id.* at 4:4–8).

The judge asked whether, beyond the phone application, Elia had "no [other] technological equipment that would assist [him] in . . . digest[ing]" evidence "presented . . . in a visual form?" (*Id.* at 4:10–13). Elia agreed and noted that the phone application would "sen[d] out . . . visual images of . . . evidence" to "AI on the web" (*id.* at 4:17–18), which would likely violate the "importance of keeping everything secret" in grand jury proceedings (*id.* at 4:16). Elia suggested that assistant D.A.s could "examine witnesses in such a way that they elicit information about the photographic and videographic evidence" so that it is "clear what it is that everyone else is seeing." (*Id.* at 5:3–7). The judge stated that the assistant D.A.s "are not allowed to narrate what it is they

[4] The parties agree that the Court may consider two grand jury transcripts from Elia's jury service and Defendant's two-page ADA pamphlet because they are "integral to or incorporated by reference in the complaint." (ECF Nos. 26-3 ("Def.'s Mem.") at 7–8; 29 ("Pls.' Opp'n") at 9). Thus, the Court will consider the transcripts and pamphlet. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

are showing" (*id.* at 5:9–10), and visual evidence like videos must "speak[] for" itself (*id.* at 5:13–14). The judge explained that it is up to the juror "to decide what relevance and what importance to place on the evidence that's being presented." (*Id.* at 5:14–18).

Elia clarified he was requesting that witnesses describe visual evidence, as had been done in earlier cases. (*Id.* at 5:22–25, 6:1–17; Compl. ¶ 7). In the prior grand jury deliberation that involved photographic evidence, the assistant D.A. had asked the witness "a lot of information about what was in . . . [the] photo," including "what each piece of the photo represented" and "where the photo was taken." (Tr. I at 6:8–10). The judge responded that witnesses cannot narrate and must simply confirm information such as whether a "picture was taken at such and such a time" and whether the photo depicts a specific location. (*Id.* at 7:8–12). Apart from testimony limited to confirmations of timing and location, however, Elia would remain unable to "glean from that testimony what the actual [location] looks like." (*Id.* at 7:10–11). The judge restated that Elia "would have to make that assessment on [his] own by looking at it" (*id.* at 7:23–24), and "there is a limit to what can be elicited by the witness" (*id.* at 8:18–19). As such, Elia's ability to process the evidence was limited "because of the fact that [he could] not actually watch[] the video." (*Id.* at 9:3–4).

The judge found that Elia was "at a significant disadvantage" because Elia would not "be able to test the witness's veracity because [he was] not seeing what other jurors [were] seeing." (*Id.* at 10:16–19). Elia responded that "the Court has a duty to accommodate" him and he "cannot be disqualified purely because [he is] blind and cannot see the videographic evidence." (*Id.* at 10:22–24). The assistant D.A. replied that they were not asking for Elia's disqualification, but rather that he be excluded from deliberation

on “certain cases like a case where [the assistant D.A.] present[s] video evidence.” (*Id.* at 11:4–5).

In a second conversation later that day, Elia emphasized to the court that “[f]ederal law, state law, [and] local law” prohibited his disqualification “from the cases that involve photographic and videographic evidence,” and that the court may not “segregate [him] based on the fact that [he has] a disability.” (*Id.* 13:13–16). The judge clarified that the assistant D.A. is not “trying to disqualify [Elia] completely” (*id.* at 14:6), and that “the law does allow for” disqualification “for certain situations if [a juror’s] condition hinders [their] ability to serve or makes [them] incapable of jury service in particular cases” (*id.* at 14:8–11).“[I]n cases where visual evidence is particularly important to the case,” the judge permitted the assistant D.A. “to disqualify [Elia].” (*Id.* at 14:12–15). If disqualified, Elia could “challenge [the assistant D.A.’s] decision[].” (*Id.* at 15:11–12).

On October 9, the assistant D.A. and the judge spoke again regarding the scope of Elia’s deliberations as a grand juror. (ECF No. 26-2, Ex. 2 (“Tr. II”) at 19:11–22). The assistant D.A. presented a jury instruction to the judge to formalize the court’s ruling, which would permit the assistant D.A.s to disqualify Elia from deliberating and voting in cases with visual evidence:

> Only those jurors who were present and who heard the evidence presented and had an opportunity to evaluate and review all of the evidence, including any video and photographic evidence on such and such dates are qualified to deliberate and vote on the charges I am about to submit to you.

(*Id.* at 20:15–20).

That same day, Elia presented a different option to the judge. (*Id.* at 22:2–4). He stated that “[t]he foreman ha[d] agreed that during deliberations if there is any visual evidence that needs to be described, he [would] describe it to [Elia].” (*Id.* at 22:1–4). If

described incorrectly, "[t]here [would be] an additional 20 other people . . . who . . . [could] go ahead and correct [the description]." (*Id.* at 22:4–6). Elia stated that the judge could either accept this modification or discharge him. (*Id.* at 22:7–10).

The judge replied that "other jurors can't tell [Elia] what they see . . . because they can have an interpretation that's different than yours." (*Id.* at 22:12–23). Moreover, visual interpretation is different from "an official hearing impaired interpreter" (*id.* at 23:4–5), because with physical evidence "such as video or . . . photographs, there needs to be an evaluation that's done visually as well as comparing and contrasting that to whatever testimony that's given in connection with that piece of evidence" (*id.* at 23:7–10). The judge proposed that Elia could "participate," "listen," and "be present during all of the presentations," but that he would "be limited in the number of cases that [he] could vote on." (*Id.* at 24:10–13). Because of this limitation, Elia requested to be discharged considering that around "75 percent" of the cases he had sat in on had "heavy videographic or photographic evidence." (*Id.* at 25:2–7). The judge discharged Elia. (*Id.* at 25:16).

II. <u>UCS's "Americans with Disabilities Act and the Courts" Pamphlet</u>

UCS's pamphlet states that UCS is "committed to ensuring that all persons have access to and can fully participate in court proceedings, regardless of disabilities." (ECF No. 26-2, Ex. 3 ("Pamphlet") at 29). The pamphlet emphasizes the importance of "flexibl[ity] and creativ[ity] in determining what accommodation is appropriate." (*Id.*) UCS has an ADA Office, which is responsible for "fashioning appropriate accommodations in particular cases, assistance in obtaining auxiliary aides and devices, and training for court personnel and judges." (*Id.* at 30).

UCS outlines two forms of accommodations for people with disabilities: (1) administrative accommodations provided by court administrators and managers, and (2) judicial accommodations ordered by a judge or judicial officer. (*Id.* at 29). Administrative accommodations include "providing sign language interpreters, assistive listening devices or CART reporting, and arranging for a court service to be provided in an accessible location." (*Id.* at 29–30). This non-exhaustive list includes services required to "ensur[e] that all persons have access" to "court proceedings." (*Id.* at 29). Judicial accommodations, however, "implicate the rights of parties to the proceeding" and may include "extensions of time for the filing of papers, taking frequent breaks during court proceedings, and remote appearances." (*Id.*) "While only a judge may order such an accommodation, non-judicial court personnel may be called upon to facilitate the accommodation." (*Id.*)

Jurors may request accommodations. (*Id.* at 30). Such requests are directed to the Chief Clerk,[5] who must then "assess[] whether the request is for an administrative or a judicial accommodation." (*Id.*) When a request for an accommodation "is made during a proceeding, the Judge can determine the request to the extent it involves a purely judicial accommodation, and should refer any request for an administrative accommodation to the Chief Clerk." (*Id.*) An administrative accommodation "may be denied *only* by a Chief Clerk . . . in consultation with the ADA Coordinator." (*Id.*) (emphasis added).

## III. Procedural History

On March 25, 2025, Plaintiffs filed the complaint alleging violations of Title II of the ADA, Section 504 of the Rehabilitation Act, and the Equal Protection Clause of the New York State Constitution for failing to provide a reasonable accommodation and for lack of

---

[5] The pamphlet indicates that reasonable accommodation requests in New York City are adjudicated by the Chief Clerk. Requests outside New York City are overseen by District Executives. (Pamphlet at 30).

policy or procedure to permit blind jurors to equally participate in jury duty. (Compl. ¶¶ 14, 31–51, 52–61, 61–66). On August 1, 2025, Defendant moved to dismiss. (ECF Nos. 26; 26-3 ("Def.'s Mem.")). Plaintiffs opposed. (ECF No. 29 ("Pls.' Opp'n")). In March 2026, Defendant submitted a supplemental letter detailing a recent decision—*National Federation of the Blind of New York State, Inc. v. New York State Unified Court System*. (ECF No. 48); No. 24 Civ. 07789 (MKV), 2026 WL 836034 (S.D.N.Y. Mar. 26, 2026). Plaintiffs replied. (ECF No. 50).

## **LEGAL STANDARD**

On a motion to dismiss, plaintiffs must offer "enough facts to state a claim to relief that is plausible on its face," such that they "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this determination, a court is "require[d] . . . to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.

"In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor." *Williams v. Richardson*, 425 F. Supp. 3d 190, 200 (S.D.N.Y. 2019) (citing *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007)). "Fact-specific question[s] cannot be resolved on the pleadings," *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001), and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## DISCUSSION

Defendant argues that (1) Sunshine is an improper party; (2) Elia lacks individual standing; (3) NFBNY fails to assert associational standing; (4) Plaintiffs fail to state a claim under Title II of the ADA and Section 504 of the Rehabilitation Act; and (5) Plaintiffs fail to state a claim under New York State's Equal Protection Clause. (Def.'s Mem. at 16–25, 30–31).

Plaintiffs contend that Sunshine is a proper party to resolve their claims, Elia and NFBNY satisfy the Article III standing requirement, and the complaint plausibly states claims pursuant to Title II of the ADA, Section 504 of the Rehabilitation Act, and New York State's Equal Protection Clause. (Pls.' Opp'n at 11–27, 30–31).

### I. Defendant Nancy Sunshine is Not a Necessary Party

As an initial matter, the Court dismisses Plaintiffs' claims against Nancy Sunshine because she is not a proper party. Where, as here, a plaintiff can "assert ADA and Rehabilitation Act claims" against government entities "directly," there is "no justification for allowing plaintiff to also assert ADA and Rehabilitation Act claims against the individual defendants in their official capacities." *Hallett v. New York State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 200 (S.D.N.Y. 2000); *see Candelaria v. Cunningham*, No. 98 Civ. 6273 (LAP), 2000 WL 798636, at *3 (S.D.N.Y. June 20, 2000) (granting summary judgment because individuals "may not be held liable under the ADA or the RA in either their individual or official capacities"). Here, the "real party in interest" is UCS and any claims against Sunshine are redundant. *See Fox v. State Univ. of N.Y.*, 497 F. Supp. 2d 446, 451 (E.D.N.Y. 2007) ("Because the State is the real party in interest for the plaintiff's claims against the individual defendants in their official capacities, it would be redundant

to permit these claims to proceed when the plaintiff already has a cause of action against the State . . . .").

Accordingly, the Court grants Defendant's motion to dismiss defendant Nancy Sunshine as a party.

II. Article III Standing

Whether a plaintiff has Article III standing is a "threshold question in every federal case" that "determine[s] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (citation omitted). "The party seeking to invoke the jurisdiction of the court bears the burden of establishing that he has met the requirements of standing." *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)) (citation modified). At the motion to dismiss stage, the "task of the district court is to determine whether the Pleading allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quotation omitted).

To establish Article III standing, a paintiff must show (i) an injury in fact, (ii) a link between the injury and defendant's actions and (iii) that "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61). Plaintiffs must assert standing for "each claim" and "each form of relief that they seek." *Id.* at 431. Here, Elia and NFBNY bring claims under the

ADA and Rehabilitation Act, and seek declaratory and injunctive relief, as well as damages.[6] Defendant asserts that Plaintiffs fail to meet all three prongs of standing.

For the foregoing reasons, the Court finds that Elia sufficiently pleaded individual standing, and UCS does not have associational standing.

A. Elia Sufficiently Pleads Standing

*i. Injury In Fact*

Defendant argues, without support, that Elia does not have the "right to a particular decision or order" by the court, and that an injury cannot be premised on "an adverse determination." (Def.'s Mem. at 17). Plaintiffs contend, however, that Elia suffered an injury because UCS "limited" Elia's grand jury service to participation in cases without visual evidence by failing to provide "accommodations and auxiliary aids." (Compl. ¶ 39).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). Here, Defendant empaneled Elia as a grand juror and then failed to provide reasonable accommodation for his participation. As per UCS's ADA pamphlet, UCS must provide reasonable accommodations to enable a person with a disability to fully participate. (Pamphlet at 29). The court's limit on Elia's participation in cases without visual evidence prevented his participation in grand jury service all together. The transcript record evidences that Defendant did not attempt to provide reasonable accommodations for Elia. This is enough to establish an injury under this

[6] Standing "is not dispensed in gross." *TransUnion*, 594 U.S. at 431. The Court assesses Plaintiffs' standing as to their ADA and RA claims together "because ADA and Rehabilitation Act claims are treated identically" and therefore "the same elements of standing apply . . . ." *Raymond v. New York State Dep't of Corr. & Cmty. Supervision*, 579 F. Supp. 3d 327, 342 n.5 (N.D.N.Y. 2022).

Circuits "low threshold which helps to ensure that the plaintiff has a personal stake in the outcome of the controversy." *John v. Whole Foods Market Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (citation modified).

*ii. Causation*

A plaintiff must also show a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560–61. In other words, plaintiff's injury must be "fairly traceable" to the defendant's conduct. *Carter*, 822 F.3d at 59 (citation modified). The injury, however, cannot result from "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. E. Ky. Welfare Rts. Org.,* 426 U.S. 26, 41–42 (1976)); *Neurological Surgery Prac. of Long Island, PLLC v. U.S. Dep't of Health & Hum. Servs.*, 145 F.4th 212, 225 (2d Cir. 2025).

Nonetheless, where a defendant's actions have a "determinative or coercive effect upon the action of someone else," and the actions of that third party cause the plaintiff's injuries, causation is satisfied. *Id.* at 225–26 (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)) (emphasis in original). "[C]ausation turns on the degree to which the defendant's actions constrained or influenced the decision of the final actor in the chain of causation." *Carver v. City of New York*, 621 F.3d 221, 226 (2d Cir. 2010); *see also Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015) ("So long as the defendants have engaged in conduct that may have contributed to causing the injury, it would be better to recognize standing.") (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2015)).

It is sufficient that an injury is "likely attributable at least in part" to the actions of a defendant. *DirecTV, LLC v. Nexstar Media Grp., Inc.*, 162 F.4th 295, 307 (2d Cir. 2025) (citation omitted). A plaintiff "need not quantify how much of the risk is attributable to

Defendants, let alone show that it is wholly attributable to Defendants," but rather must "show some reasonable connection between Defendants' conduct and their harm." *M.G. v. New York State Off. of Mental Health*, 572 F. Supp. 3d 1, 12 (S.D.N.Y. 2021); *see also Disability Rts. N.Y. v. New York State*, No. 17-CV-6965 (RRM) (SJB), 2019 WL 2497907, at *14 (E.D.N.Y. June 14, 2019), *adopted by* 2024 WL 20753 (Jan. 2, 2024) (determining that at the motion to dismiss stage, "[e]ven an indirect role in causing an injury can be the necessary nexus for standing").

Defendant argues that Elia's injury is not fairly traceable to its actions because UCS cannot "direct or compel" an ADA or judge "to grant a reasonable accommodation." (Def.'s Mem. at 18). Plaintiffs counter that they challenge the process leading up to the judge's decision that ultimately led to Elia's exclusion, not the result of the conversations between Elia and the judge. (Pls.' Opp'n at 15).

The Court agrees with plaintiffs. Elia's injury—*de facto* exclusion from service on a grand jury—is "fairly traceable" to Defendant's conduct because UCS's lack of an ADA accommodation procedure had a determinative effect on the judge's decision to exclude Elia. *See Carver*, 621 F.3d at 226. UCS is responsible for "training . . . court personnel and judges" on ADA requirements and reasonable accommodations so "all persons have access to and can fully participate in court proceedings, regardless of disabilities." (Pamphlet at 29–30). When asked what to do regarding Elia's participation in cases with visual evidence, the judge stated that they "would like to have a sol[ution] for this, but [they did not] see how there [could] be a sol[ution]." (Tr. I at 10:10–11). This is enough to satisfy Article III's causation requirement. *See Nat. Res. Def. Council*, 397 F. Supp. 3d at 440 (S.D.N.Y. 2019) (quoting *Dep't of Com.*, 588 U.S. at 768) ("The fact that a plaintiff's

causation theory rests ultimately on the choices of third parties does not by itself preclude standing.").

USC asks the Court take judicial notice of the court's decision in *Nat'l Fed'n of the Blind of N.Y. State, Inc. v. New York State Unified Ct. Sys.*, No. 24 Civ. 07789 (MKV), 2026 WL 836034 (S.D.N.Y. Mar. 26, 2026) ("*NFBNY I*"). There, the New York County Civil Court dismissed a woman from a serving on a jury in a criminal trial that included evidence with "text messages and photos" because she was blind and would not be able to see the evidence. *Id.* at *2. Both defense counsel and the prosecution agreed to excuse plaintiff and the judge "ultimately agreed." *Id.*

The court reasoned that blind woman lacked standing because her injury "stem[med] not from any action or inaction" of defendants, "but rather, flow[ed] purely from the intervening act of the trial court in exercising its discretion to excuse Plaintiff at the request of both parties in that case." *Id.* at *5. The court found that plaintiff's exclusion presented "a unique interaction between a New York state trial judge's discretion in excusing jurors, a criminal defendant's constitutional right to a fair trial, and the rights under the ADA and Rehabilitation Act of a disabled individual to serve on a jury." *Id.* In sum, defendants' actions did not sufficiently cause plaintiff's alleged injury. The Court recognizes that similarities exist between the two cases—mainly that Elia's exclusion occurred during jury proceedings and was court-ordered. However, significant differences warrant a different result here.

First, unlike in *NFBNY I*, Elia served on the grand jury. (Compl. ¶ 6). Once empaneled, the court categorically excluded Elia from all future cases with visual evidence. (Tr. II at 20:16–17). Dismissal during *voir dire* at the consent of all parties based

on the evidence in a singular case is not that same as a categorical exclusion from all cases with visual evidence, particularly when most cases today include some form of visual evidence. Second, the judge's instruction here did not result from consideration of the type of evidence in each specific case before the grand jury. Unlike *NFBNY I*, the judge did not conduct a fact-specific, or case-specific inquiry that led to Elia's exclusion from voting on a particular case. *NFBNY I*, 2026 WL 836034, at *5. Rather than a tailored determination of "whether a potential juror's disability prevents [them] from providing reasonable jury service even with accommodations" in a particular case, the judge excluded Elia from *all* cases with visual evidence. *Id.*

In sum, Elia sufficiently pleads a causal connection between his injury and Defendant's conduct.

*iii. Redressability*

Lastly, to establish Article III standing, plaintiffs must plead that judicial intervention will redress their alleged injury. Plaintiffs may establish redressability where it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560–61 (quoting *Simon,* 426 U.S. at 38). In other words, redressability "is the 'non-speculative likelihood that the injury can be remedied by the requested relief.'" *Coal. of Watershed Towns v. U.S. E.P.A.*, 552 F.3d 216, 218 (2d Cir. 2008) (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP,* 549 F.3d 100, 106–07 (2d Cir. 2008)). Plaintiffs may satisfy this requirement by showing that "a favorable decision [would] relieve a discrete injury," but the decision need not "relieve . . . *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original). Rather, a plaintiff may merely "plausibly allege that a 'risk' of future harm 'would be reduced' if it

were to receive that relief." *DirecTV, LLC v. Nexstar Media Grp., Inc.*, 162 F.4th 295, 308 (2d Cir. 2025) (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007).

Defendant argues that a favorable opinion for Elia would not redress the alleged injury because there "is no administrative relief that can be provided" by Defendant "that would have changed the outcome," and that UCS cannot change the circumstances where "deliberat[ion] on a case due to a disability . . . prevents such individuals from reviewing evidence at the potential detriment of a defendant." (Def.'s Mem. at 18). UCS further argues that Plaintiffs' notion is otherwise speculative because the likelihood of Elia getting summoned for jury duty, getting empaneled, and serving on a case that includes visual evidence, "*are all entirely speculative circumstances*." (*Id.* at 19) (emphasis in original). Plaintiffs counter that although judges have discretion to "grant accommodations," they "cannot conjure them from thin air"—namely, "[w]ithout processes in place for identifying and providing accommodations, decisions about juror ability are made on an ad-hoc basis, based on guesswork and assumptions." (Pls.' Opp'n at 12).

Defendant's arguments are unavailing. UCS misconstrues Elia's alleged injury. Plaintiffs do not contest judicial discretion. Rather, they challenge the "systemic practices of the jury clerk and commissioners." (*Id.* at 14 (quoting *Powers v. Ohio*, 499 U.S. 400, 415 (1991)). The current lack of a reasonable accommodations procedure for blind individuals ensured that the judge could not exercise *any* discretion. A judge cannot use their discretion to grant or deny accommodations that do not (but should) exist. Elia's exclusion from the grand jury stemmed directly from the failure of the court system to provide reasonable accommodations to ensure Elia had the opportunity to participate in the grand jury. Judicial resolution would redress plaintiffs' injuries "to some extent"

because a reasonable ADA accommodation would plausibly facilitate equal access to jury service, reducing the "risk of future harm." *DirecTV*, 162 F.4th at 308 (quoting *Massachusetts*, 549 U.S. at 526).

To the extent that Elia seeks prospective injunctive relief, he does so to ensure that Defendant has reasonable accommodations for blind individuals as required under the ADA and the Rehabilitation Act. We need not decide at this stage whether Elia will necessarily be entitled to that relief. *See DirectTV*, 162 F. 4th at 308.

For the foregoing reasons, the Court finds that Elia has Article III standing to maintain his suit.

B. NFBNY Does Not Establish Associational Standing

An organization has standing to sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The first two requirements are constitutional limitations, and the third is a "prudential limitation that may be abrogated by Congress." *Disability Advocs., Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir. 2012); *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 556–57 (1996) (the third prong of associational standing focuses on matters of administrative convenience and efficiency, not on elements with the meaning of the Constitution). Prudential principles are "'judicially self-imposed limits on the exercise of federal

jurisdiction,' and may be altered." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016) (quoting *Bennett*, 520 U.S. at 162).

Despite satisfying the first two *Hunt* factors, the Court agrees with Defendant that NFBNY does not satisfy *Hunt's* third prong. Here, as in *Disabled in Action of Metro. New York v. Trump Int'l Hotel & Tower*, Elia "seek[s] the same injunctive relief" as NFBNY, and "the participation of [Elia] will be necessary at trial to determine whether they have standing under the higher burden of proof." No. 01 Civ. 5518 (MBM), 2003 WL 1751785, at *10 (S.D.N.Y. Apr. 2, 2003). Where, as here, NFBNY's claims "rely on the participation" of Elia's unique experience serving on the grand jury, "standing cannot be sustained." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 175 (2d Cir. 2004).

Thus, the Court grant's Defendant's motion, and NFBNY is dismissed as a plaintiff.

### III. Plaintiff States a Claim under Title II of the ADA and Section 504 of the Rehabilitation Act

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act "prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against 'otherwise qualified' disabled individuals." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (quoting 29 U.S.C. § 794(a)).

ADA Title II and section 504 Rehabilitation Act claims "impose identical requirements" and are therefore considered "in tandem." *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999); *see also Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002) ("Apart from the Rehabilitation Act's limitation to denials of benefits

'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) ("Indeed, unless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically").

To state a claim under the ADA and section 504, a plaintiff must demonstrate (1) they are "a qualified individual with a disability," (2) the defendant is subject to the ADA and the Rehabilitation Act, and (3) they were "denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or [were] otherwise discriminated against by the defendant because of [their] disability." *McElwee*, 700 F.3d at 640 (2d Cir. 2012); *see also Henrietta*, 331 F.3d at 272 (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir.1998)). "[T]he demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." *Henrietta*, 331 F.3d at 277.

Here, only the third prong is in dispute: whether "plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities."[7] *Id.* at 272. Defendant asserts UCS was "not involved nor responsible for the limitations placed on Elia" because Elia was "solely responsible for his dismissal from grand jury duty," and that Plaintiffs "fail[] to allege facts sufficient to demonstrate [that Elia]

[7] Defendant concedes that Elia is "a qualified individual with a disability" and that UCS is "subject to Title II of the ADA." (Def.'s Mem. at 22). Defendant disputes whether UCS receives "federal funding for purposes of being subject to the Rehab[ilitation] Act." (Def.'s Mem. at 22 n.12). Plaintiffs "agree that this is a factual question which should be determined in discovery and briefed at the summary judgment stage if it remains in dispute." (Pls.' Opp'n at 18 n.3). The Court reserves decision on whether Defendant was subject to the Rehabilitation Act "at the time of the purported violation." *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 113 (2d Cir. 2001).

was wrongfully disqualified." (Def.'s Mem. at 23). According to Defendant, "there is no substitute for directly viewing evidence as a juror," and therefore, UCS provided a reasonable accommodation to Elia by granting him "the ability to deliberate and vote on cases that did not have substantial visual evidence." (*Id.* at 23–24). Elia, however, contends that UCS wrongfully denied him a reasonable accommodation "in the form of auxiliary aids or adaptive technology." (Pls.' Opp'n at 20).

Elia sufficiently pleads a claim under Title II of the ADA and the Rehabilitation Act because he alleges that Defendant's failure to provide a reasonable accommodations procedure denied Elia the "opportunity to participate in or benefit from defendants' services, programs, or activities" on the basis of his disability.[8] *See Henrietta*, 331 F.3d at 272 (citing *Doe*, 148 F.3d at 82). The court limited Elia's participation in grand jury deliberations because of his blindness by ordering a jury instruction that disqualified him from voting on cases with "any video and photographic evidence" since he could not "evaluate and review" visual evidence. (Tr. II at 20:15–20). According to Elia, disqualification from proceedings with visual evidence excluded Elia from participation in about "75 percent" of cases. (Tr. II at 25:2–3). Prior to providing the instruction, the judge stated they could not "see how there [could] be a sol[ution]" to allow Elia to participate in those cases with visual evidence. (Tr. I at 10:10–11). This response contradicts Defendant's ADA pamphlet that explains UCS is responsible for "training court personnel

---

[8] Because, as explained below, the Court dismisses Elia's claim under the New York Constitution, Elia may not recover emotional distress damages. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022) (reasoning that emotion distress damages are unavailable under the Rehabilitation Act); *see also Doherty v. Bice*, 101 F.4th 169, 173–74 (2d Cir. 2024) (same as applied to the ADA). However, based on Elia's allegations, he could be entitled to other forms of compensatory damages beyond emotional distress damages. And even if Elia is unable to demonstrate proof that he is entitled to such damages, he may "nevertheless be entitled to nominal damages in the event that Defendant is found liable on his federal claims. *Fantasia v. Montefiore New Rochelle*, No. 19 Civ. 11054 (VB), 2022 WL 20540940, at *5 (S.D.N.Y. June 16, 2022).

and judges" in accommodations procedure and "ensur[ing] that all persons with disabilities have full and equal access to the courts." (Pamphlet at 29, 30). Simply put, the court empaneled Elia to the grand jury without offering an accommodation that would permit his participation alongside his peers. This is sufficient to state a claim under Title II of the ADA and Section 504 of the Rehabilitation Act, and the Court denies Defendant's motion to dismiss Plaintiff's ADA and Rehabilitation Act claims. *See Henrietta*, 331 F.3d at 277.

IV. Plaintiff Fails to State a Claim Under the Equal Protection Clause of the New York State Constitution[9]

The New York State Constitution in force in October 2024 stated, in part, that:

> No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.

N.Y. CONST. art. I, § 11 (2024).[10]

Kings County Supreme Court selected Elia for grand jury service in October 2024—prior to the inclusion of "disability" as a suspect class in the state's equal protection clause. At that time, the "State constitutional equal protection clause . . . [was] no more broad in coverage than its Federal prototype." *Esler v. Walters*, 56 N.Y.2d 306, 313–14 (1982) (quoting *Dorsey v. Stuyvesant Town Corp.*, 299 N.Y. 512, 530–31 (1949). Thus,

[9] The Court exercises supplemental jurisdiction over this claim because Plaintiff's claims pursuant to the New York State Constitution "are so related to [the Federal] claims in the action within such original jurisdiction that they form part of the same case or controversy," 28 U.S.C. § 1367, and the "state and federal claims . . . derive from a common nucleus of operative fact," *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

[10] In November of 2024, voters in New York State expanded the equal protection clause (informally known as the Equal Rights Amendment), and the amended clause went into effect on January 1, 2025. The ERA added "disability" as a protected class. N.Y. CONST. art. I, § 11 (2025) ("No person shall, because of . . . disability . . . be subjected to any discrimination in their civil rights . . . .").

New York State's "equal protection guarantees [were] coextensive with the rights protected under the Federal Equal Protection Clause" at the time of Elia's grand jury service. *Myers v. Schneiderman*, 30 N.Y.3d 1, 13 (2017).

Here, Elia alleges discrimination based on disability. "Persons with disabilities are not a suspect class and review of their equal protection claims are subject to rational basis review." *Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 340 (E.D.N.Y. 2014). Rational basis review is "highly deferential," *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993)), and government action under this review "is accorded a strong presumption of validity." *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993). Thus, courts uphold state action where "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Marino*, 18 F. Supp. 3d at 340 (quoting *Heller*, 509 U.S. at 320). "Rational basis review, however, does require some scrutiny of state and local government activity." *Winston*, 887 F.3d at 560 ("[W]hile rational basis review is indulgent and respectful, it is not meant to be 'toothless.'" (quoting *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012)).

Plaintiffs allege that Defendant's "policies and programs deny blind individuals who possess all requisite juror qualifications participation in jury service on an equal basis with similarly-situated sighted jurors." (Compl. ¶ 65). Defendant responds that the limitations placed on Elia's grand jury service were "appropriate," and permitting Elia to deliberate without independently viewing the visual evidence "would prejudice the [criminal] defendants in violation of their fundamental rights." (Def.'s Mem. at 24). Even if the Court "draw[s] all reasonable inferences" in Plaintiffs' favor, Elia does not "plausibly allege facts

that would overcome the policy rationales" asserted by Defendant. *See Winston*, 887 F.3d at 560.

Thus, the Court grants Defendant's motion to dismiss Plaintiff's New York State equal protection claim.

## CONCLUSION

For the reasons set forth above, the Court grants Defendant's motion to dismiss in part and denies it in part. NFBNY is dismissed as a plaintiff, Nancy Sunshine is dismissed as a defendant, Elia's state equal protection claim is dismissed, and Elia's ADA and Rehabilitation Act claims remain.

SO ORDERED.

/s/ Ramón E. Reyes, Jr.
RAMÓN E. REYES, JR.
United States District Judge

Dated: September 14, 2026
Brooklyn, New York